(100 South. 685)

No. 24504.

## J. & G. LIPPMAN v. RICE MILLERS' DISTRIBUTING CO., Inc.

(April 21, 1924. Rehearing Denied by Whole Court June 7, 1924.)

*(Syllabus by Editorial Staff.)*

1. Sales ⊂⇒48¾, New, vol. 16A Key-No. Series—Illegality of consideration held to affect whole agreement.

Illegality of price in contract for purchase of rice, in that it embraced double brokerage contrary to rules of food administration, *held* to affect entire agreement.

2. Brokers ⊂⇒105—Knowledge of broker as to illegality of price held imputable to both buyer and seller.

Knowledge of broker negotiating sale of rice, who, under Rev. Civ. Code, art. 3016, was mandatory of both purchaser and seller that price agreed upon included two brokers' commissions in violation of food administration regulations, *held* imputable to both buyer and seller.

3. Sales ⊂⇒48¾, New, vol. 16A Key-No. Series—Seller of rice held bound by food administration's ruling, regardless of correctness.

Seller of rice *held* bound to accept and obey ruling of food administration, acting under Food Control Act, that particular sale of rice was contrary to its regulations until set aside or modified, regardless of its correctness.

4. Sales ⊂⇒181(11)—Evidence held to show that neither party deemed contract breached until government commandeered goods.

Correspondence *held* to show that neither party to contract for sale of rice deemed it breached until government commandeered same for army use.

5. Sales ⊂⇒172—Commandeering of rice before shipment held to relieve seller from liability for nonshipment.

Seller of rice, under contract exempting it from liability for failure to deliver, due to "war or any circumstances or accidents beyond the control of the shipper," *held* not liable for nondelivery, where same was commandeered by government for army use before shipment.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by J. & G. Lippman against the Rice Millers' Distributing Company, Inc. Judgment for defendant, and plaintiff appeals. Affirmed.

Denegre, Leovy & Chaffe, and Jas. Hy. Bruns, all of New Orleans, for appellant.

Monroe & Lemann and Nicholas Callan, all of New Orleans, for appellee.

By Division A, composed of O'NIELL, C. J., and ROGERS and BRUNOT, JJ.

ROGERS, J. Plaintiff, a nonresident corporation, appeals from a judgment dismissing its suit for damages for breach of contract.

Under the terms of the agreement, which was in writing, defendant, a domestic corporation, sold and agreed to deliver to plaintiff 5,000 bags of fancy blue rose rice, "shipment as soon as embargo is lifted."

The contract was negotiated through the I. Silverberg Commission Company, of New York City, and was signed on November 23, 1917, by plaintiff, as buyer, and by said brokerage firm, as broker, and was accepted by defendant on November 27, 1917.

The contract was entered into subject to the following, among other, conditions, viz.:

"(f) No liability shall arise hereunder against shipper for failure to make deliveries due to strikes, fire, loss of merchandise in transit, embargoes on freight, postponement in sailing of steamers, car shortage, acts of God, *war, or under any circumstances or accidents beyond control of shipper.*

"(g) Seller shall not be responsible for delay in delivery due to failure of carriers to

furnish equipment, *or to any other causes beyond its control.* * * *" (Writer's italics.)

An embargo in effect at the time prevented the shipment of the rice, and the quantity of the commodity called for by the contract was allotted to plaintiff in the mills of the Louisiana State Rice Milling Company, of which defendant was a subsidiary and selling agency.

With the exception of the periods from December 17, 1917, to December 30, 1917, and from February 20, 1918, to March 13, 1918, the embargo was maintained until May 16, 1918. The specific lot of rice which had been set aside for the purpose of filling the contract was commandeered by the United States government on March 23, 1918.

Plaintiff contends that the contract was breached on March 6, 1918. It has assumed the position that, as the embargo was off from December 17, 1917, to December 30, 1917, and from February 20, 1918, to and beyond March 6, 1918, defendant, in response to its repeated demands, should have shipped the rice during said periods.

Defendant's answer to this contention is that, as the price at which the rice was sold included a double brokerage charge, the sale was in violation of the ruling of the United States Food Administration, and that as long as said ruling was in effect, it could not make the shipment without endangering its license and without subjecting itself to possible criminal prosecution. The Food Administration's ruling was not modified until March 13, 1918, after the double brokerage had been eliminated and price reduced, at which date, however, the embargo was still in effect.

The evidence shows that the transaction was initiated by the Silverberg Commission Company by means of a telegram in which on behalf of an unknown buyer it solicited defendant to sell the rice with the proviso, however, that a brokerage of 11 cents must be figured on in order to make the trade.

An exchange of letters and telegrams followed, in the course of which defendant, in one of its letters, expressed its willingness to allow the double brokerage, equivalent to 11 cents per pocket, provided it could be done "without violating the rules and regulations recently published by the Food Administration." The result of these mutual communications was the contract which forms the basis of the present suit.

In order to remove any doubt as to the legality of the transaction defendant, on November 23, 1917, the day on which it accepted the contract, addressed a letter to the United States Food Administration at Washington. In this letter the entire transaction was set forth, and a ruling was requested thereon. In reply the Food Administration advised defendant that it would not be justified in paying two commissions on one transaction, "as an operation of this kind would be regarded as without reasonable justification and tending to result in higher price to the retailer or consumer." Copies of these letters were immediately sent to the Silverberg Commission Company, with the request that said company take the matter up with the authorities at Washington with a view of obtaining some suggestion which would allow defendant to ship the goods and pay the additional brokerage.

After some further correspondence between defendant and the broker, the latter, under date of February 5, 1918, wired defendant to ship plaintiff, "direct invoice at five cents below selling price and pay us usual brokerage; this clears matters; hurry shipment soon possible." Defendant immediately informed Mr. J. R. Legunec, of the Food Administration, of the changed conditions of the sale, and requested to be advised if shipment could be made. The reply was that "the transaction you mention is an open violation of rule 3, and cannot be permitted." This ruling remained in force until March 13, 1918, when it was held that the shipment at the

reduced price might be made. The change in the ruling was due to the efforts of defendant alone, without any assistance from either plaintiff or the commission company. At that time, however, the embargo against the shipment was in effect and before it was raised the rice was requisitioned by the government for the use of the army.

It is argued on behalf of plaintiff that defendant is liable for its breach of the contract, because the contract itself carried no provisions with regard to the brokerage commissions, and could not be tainted, therefore, with illegality; that the rules of the Food Administration merely prohibited the payment of two brokerage commissions, and had no effect upon the validity vel non of the contract; and that, as a matter of fact, no ruling had ever been made preventing the shipment of the rice under the agreement.

[1] The brokerage feature was inseparably involved with the contract. The double brokerage was included in the price. Without elimination of the brokerage the price was not susceptible of reduction to the legal requirement. The price was an integral part of the contract. Its illegality affected the entire agreement, which remained so affected until a new bargain at a new price was agreed to by the parties. 15 C. J. 512.

It is true Mr. L. J. Lippman, of the plaintiff company, testified he had no knowledge of the double brokerage, nevertheless he knew that there were two intermediate parties between his company as buyer and the defendant company as seller; namely, the American Trading Company and the Silverberg Commission Company. As one experienced in the business, familiar with the market prices of rice and the custom of the trade as to commissions, he must have known that the price which his company had agreed to pay included additional brokerage, and it was this price which rendered the contract invalid under the rules of the United States Food Administration. The witness was also aware that the agreement was subject to the rules, regulations, and orders of said Food Commission, which was clothed with full authority to examine into each individual transaction with a view of ascertaining whether the agreed purchase price was fair and reasonable.

[2] It is certain that the Silverberg Commission Company, whose name, as buyer, is attached to the contract, was in possession of all the facts. It was through said broker the price was agreed upon. The broker was the mandatary of both parties. R. C. C. art. 3016. Since the knowledge of the agent in reference to the business in which he is engaged under authority of the principal is imputable to said principal, it necessarily follows that both plaintiff and defendant were charged with constructive knowledge, regardless of actual knowledge, of all material facts and information in the possession of their said agent acting within the scope of his employment.

[3] For the purposes of this case it is unimportant to determine whether the rules of the Food Administration did, in point of fact, prohibit the double brokerage charge. The Food Administration did rule that the transaction was in violation of its regulations and could not be permitted. Whether this ruling was correct or not is beside the point. As the agency designated by the President of the United States to carry out the provisions of the Food Control Act of August 10, 1917 (40 Stat. 273, 276) the Food Administration was clothed with ample power to prohibit the transaction; it was defendant's duty to accept and obey its orders until they were set aside or modified in the usual and regular way.

Plaintiff's contention that no ruling whatever was made by the Food Administration is apparently founded upon some expressions contained in two letters addressed to plaintiff's New York City counsel in April and May, 1918, by Mr. H. H. Bundy, assistant

counsel of the Food Administration. The purport of Mr. Bundy's letters is that, while the Food Administration did hold that the double brokerage feature of the contract was a violation of its regulations, it had not expressed any opinion as to the rights of the parties to the contract as between themselves.

Whatever may have been Mr. Bundy's interpretation of the ruling in April and May, 1918, the rights and duties of the parties must be determined as they existed in February and March, 1918.

The ruling of the Food Administration is found in their letter to defendant under date of February 18, 1918, which reads:

"Washington, D. C., February 18, 1918. "In your reply refer to H. 21, JRL: M.

"Rice Millers' Distributing Company. New Orleans, La.—Gentlemen: We have your letter of February 6, and also from the Louisiana State Rice Milling Company of February 15, in reference to the transaction whereby the broker requested that you add five cents to the cost of the rice when billing same to the buyer.

"For your information will say that the transaction you mention will be an open violation of rule 3, and cannot be permitted.

"Yours truly, "[Signed]  U. S. Food Administration, "By J. R. Legunec."

There is nothing in this letter to advise defendant that it was not the intention of the Food Administration to interfere with the rights of the parties. On the contrary, the inference is otherwise, because defendant is particularly informed that the transaction "will be an open violation of rule 3," and therefore illegal, and that "it cannot be permitted"; meaning, of course, the transaction would not be permitted. The prohibition could not have been more clearly expressed.

On March 2, 1918, plaintiff wired defendant that, unless defendant would advise definite dates of shipment, plaintiff would, on March 5, 1918, buy in the open market and hold defendant for any difference between the purchase and selling price. In reply, defendant, on March 5, 1918, wired plaintiff to take the matter up with the Food Administration and have them advise defendant the transaction was legal, and not in violation of their rulings, when defendant was ready to tender the rice as per contract. In reply, plaintiff, on March 6, 1918, wired it had nothing to do with any controversy with brokers, and that "we insist upon a delivery" in accordance with the terms of the contract. On the same day defendant by telegram again informed plaintiff that the rice was available for delivery, if the Food Administration "will advise us that it would be proper under the circumstances to make delivery."

On March 7, 1918, defendant informed plaintiff that it was again taking the matter up with the Food Administration for the purpose of obtaining their sanction to deliver the rice in accordance with the contract.

The situation then was apparently satisfactory to plaintiff, who remained quiet until March 12, 1918, when it telegraphed defendant as follows:

"No report regarding our shipment of rice since yours seventh must know when shipment will move advise at once also what allowance if shipped in single bags our contract calling for doubles."

On March 13, 1918, Mr. Leguenec, of the Food Administration, arrived in New Orleans, and finally ruled the shipment was permissible. This fact was immediately communicated to plaintiff, together with the information asked for in its telegram of March 12th. The embargo was on at the time, however, which prevented the shipment, and pending its removal the rice was commandeered by the United States government.

The effect of the government's action was to leave the rice market practically bare, and it was impossible for defendant to replace by purchase on the open market an equivalent of 5,000 pockets of blue rose rice of the kind and quality specified in its contract with plaintiff.

[4, 5] From our examination ·of the record we are satisfied that neither party at any time considered the contract breached, and, up to the time the rice was taken by the government, regarded it as in full force and effect. The action of the government prevented the delivery of the rice set aside by defendant to comply with its contract, and defendant thereafter was unable to obtain on the open market rice of the quantity, kind, and quality called for by the contract. In these circumstances, and under the terms of the contract exempting the seller from failure to make delivery "due to war, or under any circumstances or accidents beyond the control of the shipper," we fail to find any liability attaching to defendant. Roxford Knitting Co. v. Moore & Tierney (C. C. A.) 265 Fed. 177, 11 A. L. R. 1415 (certiorari denied, 253 U. S. 498, 40 Sup. Ct. 588, 64 L. Ed. 1031); Tipler-Grossman Lumber Co. v. Forrest City Box Co., 148 Ark. 132, 229 S. W. 17; Denny v. Simons, 27 La. Ann. 438; Jersey Ice Cream Co. v. Banner Cone Co., 204 Ala. 532, 86 South. 382; Roy Realty Co. v. Baltman & Co., 194 App. Div. 43, 184 N. Y. Supp. 458.

Judgment affirmed.

Rehearing refused by the WHOLE COURT.